IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF TEXAS

TYLER DIVISION

| | | |
|---|---|---|
| FLOYD B. WARE, #02074286 | § | |
| VS. | § | CIVIL ACTION NO. 6:21cv101 |
| | | JURY TRIAL |
| P. KEMPT, ET AL. | § | |

MEMORANDUM OPINION AND ORDER OF DISMISSAL

Plaintiff Floyd B. Ware, a prisoner confined within the Texas Department of Criminal Justice (TDCJ) proceeding pro se, filed this lawsuit pursuant to 42 U.S.C. § 1983 alleging violation of his constitutional rights. The parties consented to allow the undersigned United States Magistrate Judge to enter Final Judgment in this proceeding under 28 U.S.C. § 636(c).

Plaintiff contended that on April 13, 2020, Defendants employed excessive force upon him in violation of the Eighth Amendment. After Defendants moved for summary judgment, which was denied, the case was set for a jury trial on February 28, 2024. While Plaintiff was appointed counsel on March 7, 2023, (Dkt. #78), he advised the Court at the May 24, 2023, status conference that he intended to try the case himself. Ware proceeded pro se at trial.

**I. Trial Testimony**

Trial commenced on February 28, 2024. After the jury was selected and sworn, Plaintiff presented his opening statement to the jury. Defendants reserved their opening statement for their case-in-chief. The Court then reminded Plaintiff that it was his turn to put on evidence—and inquired whether he was the only witness in his case, to which the Plaintiff responded "correct." Plaintiff was sworn in and took the stand.

When prompted to tell the jury what happened and why he was bringing his case, Ware testified, "like I said, it was cruel and unusual punishment, Eighth Amendment violation," (Dkt.

1

#134, pg. 7). He further testified that he "was held down and beat by the correctional officers, the Defendants. And I was watched by Daniel Jett, who was supposed to stop—who commenced— commenced the use of force." *Id*. Ware further stated that he was "held down and beat savagely with the riot gear, fists. A knee pad was placed on my neck by Akabogu, also known as AK. I don't know if you can see that in that video or not. I did not review the video, by choice, but I know it is there. I know it is somewhere," *Id*. at pg. 7.

Ware testified that he received injuries, characterizing them as "all sorts of injuries. Mental injury. I had a tooth injury," and that he received Amoxicillin for 14 days. He also stated that he "had a black eye," and post-traumatic stress disorder. *Id*. at pg. 8. The Court inquired to Ware whether there was anything else he wanted to share with the jury about his claims, to which Ware testified, "they are all true. My claims is true. I made sure of it." *Id*. When the Court stated that it wanted Ware "stick to the facts about what happened," Ware replied "absolute facts. Nothing overbroad, nothing I said there." *Id*. When asked if there was anything further he wanted to say, Ware testified, "no that's it." *Id*. at pg. 9.

During cross-examination, Ware testified that he recognized the "cell situation" depicted in the picture made from the video. He testified that the "imaging outside—outside the—and the walkway and catwalk" was from a different surveillance video. Ware testified that he refused to watch the video, and counsel for the Defendants admitted Exhibit 1—a picture of the cell Ware occupied—after Ware explained he had no objection. *Id*. at pg. 10.

Ware testified that he was in cell D-44 on April 13, 2020, as evidenced by the picture of the cell or "catwalk." When asked about "a third of the way up from the floor, it looks like there is some—there is some white stuff on that cell," Ware testified that "the time that [he] had that cell [he] refused to give up [his] trayslot. It is obvious that there was attention needed. There was none.

2

But, yes, I had stopped the food slot," (Dkt. #134, pg. 12). He explained that a "trayslot," at that time, was for recreational purposes. They allowed us to open it. The only way you can get those like that is if the correctional officer allows that." *Id.*

He also testified that the trayslot is "something that officers pass things through" to the prisoners—such a food, medicine, and papers. *Id.* at pg. 13. Ware explained that the slot could stay open "if they allow us to," and further testified that his tray slot was "already open." Testifying that he was having a dispute with his neighbor in cell number 45, Ware explained that he was "cell warring" because he was "trying to get moved" away from the neighbor. *Id.* at pg. 15. He testified that his trayslot was involved to get him moved—as "that is the whole reason, to get attention," articulating "can you move me? Can you move me?"

When asked if he "ended up getting attention," Ware responded, "of course. A use of force." *Id.* at pg. 16. Ware testified that he was told to close his trayslot and to "give it up," and that he refused because he "was trying to get moved." *Id.* at pg. 17. As a result, a use-of-force was initiated. Ware testified that Defendant Jett "watched [him] get beat." He confirmed that Defendant Jett "didn't beat [him]," but watched. He then stated that Defendant Akabogu "punched in [his] face. He took off his helmet and—and brung [sic] down upon [him] and put his knee on [his] neck." *Id.* at pg. 19.

Ware then began testifying about what allegedly occurred inside his cell after refusing to relinquish control of the trayslot. Specifically, the testimony appears as follows:

```
11    Q.   In those allegations, you admitted that you fought the

12    officers when they came into your cell; is that right?

13    A.   I've never admitted that.  I assure you I never said

14    that.

15    Q.   Didn't you say that you threw the shield to the side?

16    A.   That is not fighting.  That is defending myself.  What

17    are we -- what are we doing -- listen, I am an inmate without

18    a weapon or any guarantee.  I am not going to put my hands on

19    a correctional officer unless I'm fighting for my life.

20    Q.   I apologize.  So when the officers came into your cell,

21    you defended yourself?

22    A.   Nope, I just moved the correctional officer, that is not

23    here, to the side.

24    Q.   How did you do that?

25    A.   Just like that (demonstrating).
```

```
1    Q.   You grabbed him and moved him to the side?

2    A.   Just like that (demonstrating).

3    Q.   All right.

4    A.   If that is assault, then I am a damn fool that deserves

5    life in prison.

6    Q.   Okay.

7    A.   Excuse my language.
```

Dkt. #134, pg. 19-20. Counsel then stated he had no more questions for Ware.

The Court then explained that Ware had the opportunity to "redirect," or respond to anything from cross-examination—and asked whether there was anything he would like to add before stepping down, to which Ware responded, "I would like everybody that came, showed, to know that I am grateful, and I really, really sincerely apologize for this day. Thank you." *Id*. at pg. 20. When asked if there was anything other evidence he wished to present in his case—or if he

was finished with his presentation of his case—Ware responded, "I think what I have said and what I have submitted is sure enough to do. If not, I know the appeal process." *Id*. at pg. 20-21. Ware then reiterated that he had nothing further to add:

```
1   is sure enough to do.  If not, I know the appeal process.
2           THE COURT:  Okay.  I mean, this -- all this going
3   back to the jury -- all that is part of this case is what we
4   are doing right here in the courtroom.  I am asking you this
5   one final time do you have anything else to --
6           MR. WARE:  No, Your Honor.
7           THE COURT:  Okay.
```

*Id*. at pg. 21. Defendants then explained that they sought to make a motion outside the presence of the jury, at which point recess was taken and the jury exited the courtroom.

## II. Defendants' Motion for a Directed Verdict

Defendants moved for a directed verdict under Federal Rule of Civil Procedure 50. Defendants maintained that Ware raised a claim of excessive force under the Eighth Amendment—the standard of which is "whether force was applied in a good-faith effort to maintain or restore discipline, or to maliciously and sadistically for the very purpose of causing harm." *Id*. at pg. 22. Citing *Whitley v. Albers*, 475 U.S. 312, 322, Defendants argued that Ware's "claims must fail if Defendants acted with even an arguable effort to maintain or restore discipline." *Id*.

Defendants contended that Ware had been fully heard, and failed to present more than a scintilla of evidence to support his claim. During his presentation, Ware admitted that Defendant Jett did not use force against him—clarifying twice that Defendant Jett "just watched," (Dkt. #134, pg. 23). Defendants further maintained that "the only Defendant that he alleges even touched him

5

was Defendant Akabogu," and Ware "does not allege any facts against the remaining Defendants." *Id*. Consequently, Defendants insisted, "no reasonable jury would have a legally sufficient evidentiary basis to find for the Plaintiff or any of these Defendants besides Akabogu." *Id*.

Moreover, Defendants asserted that force was applied as a "direct result" of Ware's failing to comply and follow orders. Ware admitted that he refused to comply with orders—as he has been "told to release control of his food trayslot, and he doesn't dispute that." Defendants also highlight that Ware admitted that "he had stopped it from closing," and that when officers entered the cell, he grabbed an officer and moved him. Defendants insisted that force was "applied only after Plaintiff admits that he had refused to comply and had grabbed an officer's shield." *Id*. at pg. 23.

Defendants argued that Ware produced no evidence of any injuries and that "there is no evidence that he has actually suffered any injury." They also maintain that Ware "cannot recover from five Defendants for the allegations of force by one. He has provided no facts and asserted none that would show or cause any connection from all five Defendants to the alleged injury." *Id*. at pg. 24. Finally, Defendants asserted that their actions were limited to only gaining compliance and maintaining control and order—and that Ware failed "to prove with any scintilla of evidence that these men acted with any malicious or sadistic intent. That is his burden, to show the intent of these men." *Id*. at pg. 25. Defendants then argued they remained entitled to qualified immunity and requested that the Court dismiss Plaintiff's claims.

Ware was asked if he would like to respond to the Defendants' motion, and Ware responded as follows:

```
 6              THE COURT:  All right.
 7              Mr. Ware, would you like to respond to the motion?
 8   So the motion is --
 9              MR. WARE:  Yes.  Objection observed.  My Eighth
10   Amendment was violated in TDCJ, Texas Department of Criminal
11   Justice.
12              I don't believe this should be ignored or
13   dismissed.  Because if it is ignored and dismissed, it will
14   continue.  I've seen people come out of those cells bleeding
15   worse than me.
16              You think that it is okay to just leave these
17   things, let these dogs lie, let's these people sit around --
18   excuse me -- let these people sit around here and come to
19   work and bring out their emotional problems on us no matter
20   what?
21              None of us mean anyone harm.  Just like me.  I
22   don't know how many that is like me, but all I wanted to do
23   was leave that cell, leave that cell to another accommodative
24   cell and pod, which they did at the end, did anyway.  But it
25   came with an Eighth Amendment, with an Eighth Amendment cruel
```

Dkt. #134, pg. 26. Ware also remarked that "they beat [him] while holding him down," and that he is serving his sentence. After a recess, the Court denied the motion—without prejudice to reurgance.

## III. Testimony Following Motion for Directed Verdict

Defendant Jett testified first. He explained that he works for the Texas Department of Criminal Justice, and has done so for 14 years. When he first started at the Michael Unit, he was a correctional officer—eventually moving up to a Sergeant, (Dkt. #134, pg. 34). He testified to his

training, particularly his training in uses-of-force. Jett explained that officers are trained "about the use of force only if it is necessary." *Id*. at p g. 35. He testified that the lowest level of force is "just the minimum amount of force necessary to gain compliance," and that he was a supervisor in April 2020. As a supervisor, Jett explained, he supervises the officers and uses-of-force. He testified that uses-of-force are not "out of the ordinary," and that he is not shocked or annoyed when he responds to one. *Id*. at pg. 35.

Jett further testified that he had no interactions with Ware prior to this particular force incident, and that he did not remember him aside from the filing of the lawsuit. Jett stated that he had "no reason to be upset or angry or want to take out frustration with Mr. Ware on that day." *Id*. at pg. 36. He explained that the incident occurred on 12 Building—which is where prison officials house the prisoners placed in administrative segregation, the highest custody level. Jett stated that the prisoners housed there are prisoners with the highest threat level, and who do not have cellmates because of their custody levels. Before a prisoner can leave his cell in administrative segregation, "they have to be placed in hand restraints, and they have to be strip searched before they come out of their cell" for the safety of the officers—all of which must be done through the food trayslot. *Id*. at pg. 37. When the slot is not being used, Jett testified that it must be closed because "an open tray slot is a threat."

When asked about the force incident with Ware, Jett testified that he was called to Ware's cell because Ware was "refusing to allow the food tray slot to be secured." *Id*. at pg. 38. Jett testified that Ware was trying to keep his tray slot open, which is not permitted because prisoners "can throw weapons out of the food tray slot. They can assault staff through a food tray—through a food slot, just numerous things." *Id*.

Upon arriving at Ware's cell, he did not allow Jett to secure the tray slot. Jett told him to secure the slot numerous times, and Ware did not comply. Ware tied a sheet to the slot as well. After Ware refused to comply, Jett called his supervisor—and a five-man team arrives because "one person can't do it." Jett testified that the first officer to enter the cell has a shield "to protect him" in case the prisoner has a weapon. Jett explained that he once again gave numerous orders to Ware, but Ware refused to secure the tray slot. Jett testified that he was not part of the five-man-team because he was the supervisor of the team. He testified the he did not touch Ware.

Jett testified that the team entered the cell and secured/gained compliance from Ware. Medical personnel were then called, and Jett testified that he did not recall if Ware had any injuries. Jett explained that he witnessed Ware speaking with a nurse at the cell, and Ware was also taken to the medical department for a full screening. *Id.* at pg. 43. When asked if he saw a black eye, a busted lip, or a busted nose, Jett testified "no." Jett explained that Ware was talking and walking on his own—jumping around in his cell. *Id.* Jett explained that he did not dispute that a use-of-force occurred, and that Ware had to be restrained. Once the direct-examination concluded, the Court inquired whether Ware sought to cross-examine the witness:

```
16          THE COURT:  Okay.
17          All right.  Cross-examination?  Mr. Ware, do you
18   have any questions for this witness?  It is your opportunity
19   to ask him questions if you have them.  If you do, I will
20   need you to take the podium.
21          MR. WARE:  No.
22          THE COURT:  Okay.  All right.  You may step down.
23          Who will be your next witness?
```

(Dkt. #134, pg. 45.).

Defendant Akabogu testified next. He explained that he was a correctional officer in April 2020. He testified that he knew Ware and had no reason to be upset or angry with him, and that he was "called on the radio by my supervisor to set up for a five-man team." *Id*. at pg. 46. Akabogu further testified that Jett initiated the use-of-force, to which he was part of the team that responded, He was considered "number one" of the team, who carries the shield. Akabogu stated that Jett ordered Ware to comply with his orders and Ware did not comply. *Id*. at pg. 47. He testified that because Ware refused to comply, he "had to enter the cell," and that it was his job to gain control. Akabogu testified that upon entering Ware's cell with his shield, Ware did not have hand restraints because he would not submit to restraints. Ware then began "pushing" and "shoving" Akabogu— "hitting everything on the shield." *Id*. at pg. 49. Akabogu testified that once Ware was in cuffs and not resisting, the force ceased and the team escorted Ware to a new assigned cell.

Akabogu testified that he did not see Ware with a black eye and did not see a busted nose. *Id*. Finally, Akabogu also denied seeing Ware with a bloody lip and his direct-examination concluded. The Court then asked Ware if he sought to question the witness, to which he again responded in the negative and the Defendants rested their case:

```
 5          THE COURT:  Mr. Ware, cross-examination?  Would you
 6    like to question this witness?
 7          MR. WARE:  Absolutely not.
 8          THE COURT:  Okay.  You may step down.
 9          Who will be your next witness?
10          MS. CARTER:  The Defendants rest at this time.
```

*Id*. at pg. 50. The Court next inquired whether Ware intended to present a rebuttal case and whether he had anything he wanted to add to his previous testimony, Ware declined, and the Defendants closed their case:

```
11            THE COURT:  All right.  Mr. Ware, you have the
12   opportunity as the Plaintiff to put on a rebuttal case at
13   this time.  Do you have anything that you would like to add
14   to your previous testimony?
15            MR. WARE:  No -- no, Your Honor.  Excuse me.
16            THE COURT:  Okay.
17            All right.  Then Plaintiff closes.
18            Defendants, you closed as well?
19            MR. LINDSEY:  (Nods.)
```

*Id*. at pg. 50.

## IV. Renewed Motion for Directed Verdict

Outside the presence of the jury, Defendants renewed their previous motion for a directed verdict. Arguing that they sought to reiterate their previous arguments but also sought to supplement. Defendants argued that Ware failed to establish personal involvement—and "did not dispute that Sgt. Jett ever used force against him," (Dkt. #134, pg. 51). Defendants further argued that Ware presented no evidence with respect to Defendant Akabogu, and "still at no point has established that the intent of any of these officers, if they acted at all, reached the level of maliciously and sadistically for the very purpose of causing harm." *Id*.

The Court then inquired whether Ware wanted to respond to the renewed motion, to which he responded that he "would like a verdict." The full exchange reads as follows:

```
25                    THE COURT:  Mr. Ware, would you like to respond to
```

```
                                                                    52

 1     the motion?  So, just for clarification, the Defendants are

 2     moving for me to dismiss the case.  And that is the motion

 3     that you are responding to.

 4               MR. WARE:  Oh, no.  No.  No.

 5               THE COURT:  I will take your response now.  The

 6     argument is that you have not -- well --

 7               MR. WARE:  I would like a verdict.

 8               THE COURT:  I understand.  Do you have a response

 9     to these arguments that you didn't meet certain elements of

10     your claim that you were required to meet?

11               MR. WARE:  No, Your Honor.

12               THE COURT:  Okay.
```

The Court then granted the motion. *Id*. at pg. 52. The jurors subsequently returned to the courtroom, at which point they were dismissed.

## V. Legal Standards

Rule 50 of the Federal Rules of Civil Procedure authorizes the entry of judgment as a matter of law "[i]f a party has been fully heard on an issue during a jury trial and the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue." *See James v. Harris Cnty., Tex.*, 577 F.3d 612, 617 (5th Cir. 2009).

A motion for directed verdict or motion for judgment as a matter of law should be granted if the facts and inferences point so strongly and overwhelmingly in favor of one party that reasonable jurors could not arrive at a contrary verdict; a "mere scintilla" of evidence is insufficient to present a question to the jury. *McDonald v. Steward*, 132 F.3d 225, 230 (5th Cir. 1998); *McCoy v. Hernandez*, 203 F.3d 371, 374 (5th Cir. 2000).

The Fifth Circuit has stated that to create a jury issue, there must be a dispute in the substantial evidence—"that is, evidence of such quality and weight that reasonable and fair-minded men in the exercise of impartial judgment might reach different conclusions," such that "a mere scintilla of evidence is insufficient to present a question for the jury." *See Sobley v. Southern Natural Gas Co.*, 302 F.3d 325, 336 (5th Cir. 2002). Even if there is more than a mere scintilla of evidence, Fifth Circuit precedent assumes that some evidence may exist to support a position which is still yet so overwhelmed by contrary proof as to yield a directed verdict. *Id.* at n.23; *Chaney v. New Orleans Public Fac. Management, Inc.*, 179 F.3d 164, 167 (5th Cir. 1999).

Turning to the substance of this case, it is well-established that the use of excessive physical force against a prisoner may constitute cruel and unusual punishment. *See Hudson v. McMillian*, 503 U.S. 1, 4 (1992). Because prison officials, when confronted with prison disturbances, have the difficult job of balancing the need to maintain and restore discipline, the core question in determining whether the force used against an inmate was applied in a good-faith effort to maintain or restore discipline inside the prison or, conversely, whether the force was applied maliciously and sadistically, for the very purpose of causing harm. *Id.* at 7; *see also Whitley v. Albers*, 475 U.S. 312, 320 (1986) ("But, in making and carrying out decisions involving the use of force to restore order in the face of a prison disturbance, prison officials undoubtedly must take into account

the very real threats the unrest presents to inmates and prison officials alike, in addition to the possible harms to inmates against whom force might be used.").

With those concerns at the forefront, the Supreme Court held that in determining whether a prison official acted maliciously or sadistically to cause an unnecessary and wanton infliction of pain, courts should consider: (1) the extent of the injury suffered; (2) the need for the application of force; (3) the relationship between the need and the amount of force used; (4) the threat reasonably perceived by the responsible officials; and (5) any efforts made to temper the severity of a forceful response. *Hudson*, 503 U.S. at 7; *see also Baldwin v. Stadler*, 137 F.3d 836, 839 (5th Cir. 1998). Each factor is neither exclusive nor determinative, as each case must be judged on its own facts. *Baldwin*, 137 F.3d at 839.

## VI. Discussion and Analysis

Defendants' motion for a directed verdict must be granted. Plaintiff Ware presented no more than a scintilla of evidence in support of his claim that Defendants violated his constitutional rights through the use of excessive force. As an initial matter, Ware testified that Defendant Jett merely "watched" the force incident—and failed to allege facts concerning any other Defendant save Defendant Akabogu. Personal involvement is an essential element of any section 1983 proceeding. *See Thompson v. Steele*, 709 F.2d 381, 382 (5th Cir. 1983) ("Personal involvement is an essential element of a civil rights cause of action.") (citing *Rizzo v. Goode*, 423 U.S. 362, 371-72 (1976) (must be an affirmative link between injury and conduct of defendant)). During trial, Ware testified that Defendant Akabogu placed his knee on his neck, (Dkt. #134, pg. 7; 8)—but never mentioned any other defendant actually used physical force, other than Defendant Jett "who just watched."

14

Accordingly, Ware failed to establish personal involvement—or any affirmative link connecting Defendants Manyango, Odumade, and Abami to any excessive force incident or other constitutional violation. A reasonable jury would therefore not have a legally sufficient evidentiary basis to find for Ware's claims against these three Defendants, as Ware failed to present even a "mere scintilla" of evidence against them. All claims against Defendants Manyango, Odumade, and Abami are **DISMISSED** with prejudice.

To the extent Ware opposes a directed verdict based on any claim concerning Defendant Jett and bystander liability, the Court first notes that mere legal conclusions are insufficient to establish a constitutional violation. *See R.A.M. Al-Raid v. Ingle*, 69 F.3d 28, 32 (5th Cir. 1995) (explaining that conclusory allegations are insufficient under section 1983); *see also Vinson v. Heckmann*, 940 F.2d 114, 115 (5th Cir. 1991) (holding that to state a claim under section 1983, a plaintiff must allege facts to support his claims).

Second, to state a claim for bystander liability under section 1983, Ware must show that the Defendant (1) knew another Defendant was violating his constitutional rights; (2) was present at the scene of the constitutional violation; (3) had reasonable opportunity to prevent the harm; and (4) chose not to act. *Whitley v. Hanna*, 726 F.3d 631, 646 (5th Cir. 2013). Courts must also consider whether the Defendant "acquiesced in" the alleged constitutional violation. *Id.*; *see also Randall v. Prince George Cnty., Md.*, 302 F.3d 188, 204 n.24 (4th Cir. 2002) ("The rationale underlying the bystander liability theory is that a bystanding officer, by choosing not to intervene, functionally participates in the unconstitutional act of his fellow officer."). Mere presence at the scene of an excessive force incident is insufficient. *See Brown v. Wilkinson Cnty. Sheriff Dep't.*, 742 F. App'x 883, 884 (5th Cir. 2018).

15

Here, during trial, Ware testified that Defendant Jett "watched him get beat," and that Jett "was supposed to stop the—who commenced—commended the use of force," (Dkt. #134, pg. 7; 18). Ware provided no further details and no additional specifics. Ware presented no additional evidence besides this sparse testimony, and he chose not to present any evidence on his own redirect. Defendant Jett testified that he never touched Ware, and Ware chose not to engage in any cross-examination to rebut the testimony. The failure to articulate any facts or specifics about Defendant Jett's alleged acts during the force incident is insufficient to show that Jett committed a constitutional violation through a bystander liability theory.

Ware's testimony during trial—that Defendant Jett "just watched" and that he "was supposed to stop the … force"—establishes, at most, that Defendant Jett initiated his subordinates to commence a force incident after Ware refused to comply with multiple orders and that he was merely present during the actual use of physical force. Such indicates nothing on whether Jett "acquiesced" in an unconstitutional force, and mere presence during a force incident is insufficient. Ware's claims against Defendant Jett are therefore **DISMISSED**, as a reasonable jury could not find for Ware on this claim with conclusory allegations and lack of specifics.

The remaining defendant in this case is Defendant Akabogu. Ware testified at trial that "[a] knee was placed on [his] neck by Akabogu, also known as AK," and that he "punched in [his] face … he took off his helmet and bring it down upon [him] and put his knee on [his] neck," (Dkt. #134, pg. 19). He further testified that he "moved the correctional officer" to the side when officers entered his cell just prior to the force; when asked if he had previously articulated that he "threw the [officer's] shield to the side" when they "came into his cell," Ware testified, "that is not fighting.  That is defending myself."

16

Upon conclusion of defense counsel's cross-examination of Ware, the Court inquired whether he sought to redirect, to which Ware responded as follows:

```
 8          MR. LINDSEY:  If I could just have one moment,
 9   please.
10          I don't have any more questions for you,
11   Mr. Ware.
12          THE COURT:  Okay.  Mr. Ware, you have the
13   opportunity to do what we call "redirect," so to respond to
14   anything from cross-examination.  Do you have anything you
15   want to add before you step down?
16                      REDIRECT EXAMINATION
17          MR. WARE:  I would like for everybody that came,
18   showed, to know that I am grateful, and I really, really
19   sincerely apologize for this day.  Thank you.
20          THE COURT:  All right.  Mr. Ware, you may have a
21   seat.
```

*Id*. at pg. 20. At this point, after declining to engage in redirect examination, Ware was asked whether he had any additional evidence he wished to present in his case, to which he declined by nothing that he essentially rested on his own testimony:

```
22            So, Mr. Ware, do you have any other evidence to put
23   on in your case, or are you finished with your part of the
24   case?
25            MR. WARE:  I think what I have and what I submitted
```

                                                            21

```
1   is sure enough to do.  If not, I know the appeal process.
```

Dkt. #134, pg. 20.

Defendant Akabogu testified that he was a correctional officer on duty during the incident,

called by his supervisor, Defendant Jett, to participate in a five-man-team use-of-force upon Ware.

Akabogu testified that he was the first man of the five-man-team, meaning he carried the shield—

and that Ware refused to comply with several of Defendant Jett's orders to close his trayslot,

forcing the five-man team to enter Ware's cell. *Id*. at pg. 47. He further explained that it was his

job to gain control of Ware and place him in hand restraints—and that Ware was "pushing" and

"shoving" him inside the cell. *Id*. at pg. 48. Akabogu testified that Ware was resisting and "hitting

everything on the shield." Once Ware was secured in restraints, Akabogu explained, the force

incident ceased. After the force incident concluded and the team escorted him to a newly assigned

cell, Akabogu called a supervisor. He testified he did not witness Ware with a black eye, a busted

nose, or a bloody lip. *Id*. at 49-50.

At the conclusion of this testimony, Ware was again asked if he wished to question

Defendant Akabogu, to which Ware responded as follows:

```
4            MS. CARTER:  Nothing further.

5            THE COURT:  Mr. Ware, cross-examination?  Would you

6    like to question this witness?

7            MR. WARE:  Absolutely not.

8            THE COURT:  Okay.  You may step down.
```

*Id*. at pg. 50. Defendants rested their case, and Ware declined to present a rebuttal.

Defendant Akabogu's testimony reveals that (1) he participated in the five-man-team as the initial, first officer to enter the cell; (2) force was ordered by his supervisor and predicated on Ware's refusal to comply with multiple orders; (3) once the team entered the cell, Ware pushed and shoved Akabogu; and (4) Akabogu did not witness a black eye, a busted nose, or a bloody lip as Ware claimed.

Even when viewed in the light most favorable to Ware, the facts and inferences point so strongly and overwhelmingly in favor of the Defendant Akabogu that reasonable jurors could not arrive at a contrary verdict.

### a. Extent of the Injury Suffered

The first element requires Ware to demonstrate that he suffered more than *de minimis* injury. While Ware testified that he had a tooth injury, a black eye, and post-traumatic stress disorder, Defendant Akabogu testified that he witnessed no black eye, no busted nose, and no bloody nose at the conclusion of the force incident. Ware chose not to cross-examine Akabogu— and presented no rebuttal, no additional evidence, or any contrary evidence on this point concerning any injuries. Even viewing the evidence in the light most favorable to Ware, it is apparent that Ware offered no more than a mere scintilla of evidence that he suffered more than a

*de minimis* injury during the force incident, which is not sufficient to survive Defendants' motion for a directed verdict.

### b. Need for the Application of Force

Next, the Court examines the need for the application of force. Ware testified that he "had refused to give up" his trayslot, he sought attention because he wanted to be moved to a different cell, (Dkt. #134, pg. 16). He also recognized that he refused to comply with multiple orders to close his trayslot, *id*. at pg. 17—and that he shoved or "moved" an officer once he entered the cell. *Id*. at pg. 19-20. Defendant Jett testified at trial that an open trayslot poses a threat, as prisoners have assaulted officers through a trayslot and thrown weapons or stopped the trayslot from being closed before, *id*. at pg. 37-38, at the Michael Unit.

Ware did not cross-examine Defendant Jett. He presented no rebuttal argument or case. The testimony at trial demonstrated that force was obviously needed. *See Byrd v. Harrell*, 48 F.4th 343, 347 (5th Cir. 2022) ("Byrd's determined resistance required determined force in response."). Ware's testimony containing conclusory allegations—coupled with his lack of presenting anything on rebuttal and failure to cross-examine any witness—reveal nothing more than a mere scintilla of evidence, at most, which does not defeat Defendants' motion.

### c. Relationship between the Need for Force and the Amount of Force Used

The next *Hudson* factor is the relationship between the need of force and the amount of the force used. In analyzing any excessive force claim, the court must examine the relationship between the amount of force used—which may be constitutionally permissible—and the context in which that force was employed. *See Ikerd v. Blair*, 101 F.3d 430, 434 (5th Cir. 1996) ("The amount of force that is constitutionally permissible, therefore, must be judged by the context in

which that force was used."). In other words, the inquiry becomes—having established in this case that force was necessary—whether the force used upon Ware was excessive to that very need.

The trial testimony demonstrates that Ware presented nothing more than a mere scintilla of evidence to support his claim that the force used, which was necessary, was excessive to that very need. While Ware testified that he was "beat savagely," he elaborated no further. His conclusory allegations—devoid of specifics—shed no light on whether the force used upon him inside the cell was excessive or repugnant.

In fact, Defendant Akabogu testified that Ware "shoved," him upon entry into his cell, which was essentially confirmed through Ware's admission that he "moved" an officer. But no further testimony was presented concerning how the force used was excessive in the face of a combative prisoner. Ware's lack of evidence does not defeat Defendants' properly supported motion for directed verdict.

### d. The Threat Reasonably Perceived

Next, the court examines the threat reasonably perceived by prison officials. It is undisputed that force was used because Ware would not comply with orders, and that he shoved or "moved" an officer once inside his cell. Moreover, Defendant Jett testified that Ware was housed in administrative segregation, which is considered "the highest custody," and the "highest-threat-level inmate," (Dkt. #134, pg. 36). Defendant Jett further testified that Ware tied a sheet to the tray slot prior to the force. *Id*. at pg. 39. Once again, Ware did not challenge this testimony, present a rebuttal, or even acknowledge any threat reasonably perceived by the Defendants. Accordingly, Ware presented no more than a mere scintilla of evidence concerning this factor—which is similarly insufficient to defeat Defendants' motion.

### e. Efforts made to Temper the Severity of a Forceful Response

Finally, the last factor concerns efforts made to temper the severity of a forceful response. Defendant Jett testified that prison officials are trained to use force only if necessary and to use only the "minimum amount of force necessary to gain compliance," (Dkt. #134, pg. 35). Defendant Akabogu testified that once Ware was in handcuffs and not resisting inside the cell, the force incident ceased. *Id*. at pg. 49. Ware did not cross-examine these witnesses—or challenge testimony regarding the cessation of the force incident. He presented no evidence regarding the tempering of a forceful response under *Hudson*, which favors Defendants and does not defeat their motion for a directed verdict.

### f. The Core Judicial Inquiry

The Supreme Court explained that the "core judicial inquiry" is whether the force was used in a good faith effort to restore discipline or maliciously or sadistically for the very purpose of causing harm. *Hudson*, 503 U.S. at 7. Ware presented no evidence on this point; his conclusionary testimony, "like I said, it was cruel and unusual punishment, Eighth Amendment violation," sheds no light on the Defendants' intent, (Dkt. #134, pg. 7; 26). Ware presented nothing concerning Defendants' intent; rather, the testimony showed that Defendants were faced with a recalcitrant prisoner who refused to comply with multiple orders to close his trayslot, and who—once the force team entered the cell—shoved or "moved" an officer. *See, e.g.*, *Williams v. Valenti*, 432 F. App'x 298, 302 (5th Cir. 2011) (use of force not malicious or sadistic where inmate was belligerent and pulled away when officer grasped his arm). In the absence of any showing of malicious or sadistic action for the very purpose of causing harm, Ware's excessive force claims fail.

As a final matter, Defendants argued that they "remained entitled to qualified immunity," (Dkt. #134, pg. 26). The doctrine of qualified immunity protects government officials from liability

for monetary damages in their individual capacities insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known. *Thompson v. Mercer*, 762 F.3d 433, 436-37 (5th Cir. 2014).  Claims of qualified immunity require a two-step analysis: First, the court determines whether a constitutional right would have been violated on the facts alleged and, second, whether the constitutional right was clearly established at the time of the alleged violated.  *Kitchen v. Dallas Cnty.*, 759 F.3d 468, 476 (5th Cir. 2014). Importantly, even if the official's conduct violated a clearly established constitutional right, the official is nonetheless entitled to qualified immunity if his or her conduct was objectively reasonable.  *See Jones v. Collins*, 132 F.3d 1048, 1052 (5th Cir. 1998).

Ware bears the burden to rebut its applicability.  *Kovacic v. Villareal*, 628 F.3d 209, 211 (5th Cir. 2010).  Such a rebuttal requires showing that all reasonable officials—similarly situated— would have known that the defendant's actions violated the Constitution.  *See Tamez v. Matheny*, 589 F.3d 764, 770 n.2 (5th Cir. 2009); *Thompson v. Upshur Cnty.*, 245 F.3d 447, 460 (5th Cir. 2001).  Conclusory allegations are insufficient to overcome the qualified immunity defense. *Williams-Boldware v. Denton Cnty., Texas*, 741 F.3d 635, 643-44 (5th Cir. 2014).

Here, no reasonable jury could have found that Ware met this burden. At most, Ware presented "merely a scintilla" of evidence in support of his claims. Mere presence at the scene of a force incident establishes no constitutional violation; likewise, with no showing of malicious or sadistic intent, Ware's claims of excessive force necessarily fail. Consequently, he failed to overcome Defendants' assertion of qualified immunity.

## VII. Conclusion

Even when viewed in the light most favorable to Ware, the facts and inferences point so strongly, overwhelmingly, and significantly in favor of Defendants that reasonable jurors could

not arrive at a contrary verdict under *Hudson* or any other theory of constitutional liability. Mere presence at the scene of a force incident is insufficient. During trial, moreover, Ware made no showing of any element under *Hudson*.

Furthermore, Ware did not cross-examine any witnesses, present a rebuttal case, or present any additional evidence besides his own sparse testimony. Ware's sparse allegations—consisting of conclusory assertions—coupled with his decision to forgo all cross-examination and presenting a rebuttal case, consist of nothing more than a scintilla of evidence. Defendants are therefore entitled to qualified immunity. Defendants' motion for judgment as a matter of law is meritorious. *See Rex Real Estate I, L.P.*, *v. Rex. Real Estate Exchange, Inc.*, 80 F.4th 607, 616 (5th Cir. 2023) ("A mere scintilla of evidence is insufficient to present a question for the jury.") (internal citation omitted). Accordingly, it is

**ORDERED** that the above-styled proceeding is **DISMISSED**, with prejudice, on the granting of Defendants' motion for judgment as a matter of law. *See* Rule 50, Fed. R. Civ. P.

So ORDERED and SIGNED this 20th day of March, 2024.

K. NICOLE MITCHELL
UNITED STATES MAGISTRATE JUDGE

24